IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KIRK D. ROBINSON,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>DR. CASTLEMAN, DR. BRANK, and BRYAN HEALTH SYSTEMS,<br><br>　　　　　Defendants. | **8:23CV451**<br><br>**MEMORANDUM AND ORDER** |

　　　　This matter is before the Court on Plaintiff Kirk D. Robinson's complaint filed on October 16, 2023. Filing No. 1. Plaintiff filed five supplements, Filing Nos. 6, 8, 9, 13 & 14, all of which have been deemed incorporated into the initial complaint and considered as part of this initial review. When the complaint was filed, Plaintiff was incarcerated within the Reception and Treatment Center (RTC) of the Nebraska Department of Correctional Services (NDCS). He remains incarcerated but is now confined at NDCS' Tecumseh State Correctional Institution. Filing No. 16. The Court now conducts an initial review of Plaintiff's claims to determine whether summary dismissal is appropriate under 28 U.S.C. § 1915(e)(2)(B).

## I. SUMMARY OF COMPLAINT

　　　　Plaintiff sued Dr. Castleman, Dr. Brank, and Bryan Health Systems (BHS), all in their individual capacities. Filing No. 1 at 2-3, 12. The following summarizes his allegations.

　　　　On May 26, 2023, Plaintiff awoke with severe pain in his left lower leg. Filing No. 1 at 14. He was transported to Bryan West Hospital in Lincoln,

Nebraska, and was diagnosed with having a deep vein thrombosis (DVT) extending the entire length of his lower left leg. Filing No. 1 at 14.

The following day, May 27, 2023, an EKG was performed on Plaintiff at the RTC. The EKG revealed atrial fibrillation (A-Fib). NDCS immediately returned Plaintiff to Bryan West Hospital. A CT scan was performed which revealed that in addition to the DVT in the lower leg, Plaintiff had dual pulmonary emboli. The Bryan West doctor stated Plaintiff was lucky to be alive. Filing No. 1 at 14; *see also* Filing No. 14 at 3. Dr. Brank and/or Bryan West Hospital prescribed a blood thinner, Eliquis, to be taken daily. No other treatment was provided or scheduled at that time.

On June 13, 2023, Plaintiff had severe left leg pain and was again transported to Bryan West Hospital. A CT scan and MRI were performed. Plaintiff's pulmonary emboli had not improved. The emergency room doctor diagnosed a "tweaked muscle" in the left leg, indicating he believed Plaintiff's lower leg pain was (and perhaps had always been) muscle-related. Filing No. 1 at 15.

Plaintiff complained of leg pain on August 3, 2023, and he was seen by the RTC medical staff. At that appointment, he was "encouraged several times to take his prescribed Eliquis." Filing No. 13 at 3.

On August 7, 2023, Plaintiff was transported to Bryan East Hospital for a consultation appointment. The APRN said cardioversion would be performed to address Plaintiff's atrial fibrillation provided Plaintiff was compliant with taking his Eliquis for 30 days. Plaintiff missed a dose on August 17, 2023. Filing No. 1 at 18.

Plaintiff saw Dr. Brank on September 28, 2023. The left leg remained swollen and sore. The doctor's records state Plaintiff was compliant with taking his Eliquis, and he wanted prompt treatment of his atrial fibrillation. Dr.

Brank said he would contact cardiology and schedule a cardioversion appointment. Filing No. 13 at 5. Plaintiff did not take his prescribed Eliquis the following two days, September 29 and 30. Filing No. 1 at 18.

As of October 3, 2023, Plaintiff had heard nothing about scheduling the cardioversion. He sent an inmate interview request (IIR) complaining that the procedure had not been scheduled. Filing No. 1 at 18. On October 5, 2023, NDCS responded, explaining the cardioversion was not scheduled because Plaintiff had not taken his Eliquis on August 17, September 29 and 30, and October 4. Plaintiff was again instructed to take the medication for 30 consecutive days, and warned that if any doses were missed, the cardioversion could not be performed or even scheduled. Filing No. 1 at 15, 18.

Plaintiff filed an emergency grievance on October 7, 2023, stating he had missed only four doses of the medication over a two-month period, was seen by Dr. Brank a week ago and his laboratory results were normal, and cannot exercise until his atrial fibrillation is treated. Filing No. 1 at 19. The emergency grievance was rejected because Plaintiff was not facing an immediate risk of harm.

Plaintiff then decided he would stop taking Eliquis since the NDCS had apparently decided "it can make me suffer from one medical condition if the other one is taken care of." Filing No. 6 at 1. In his IIR dated October 8, 2023, Plaintiff wrote, "I am not going to take the Eliquis any longer. . . . Let's get the A-Fib fixed first, then take care of the blood clotting problem." Filing No. 6 at 3. NDCS responded on October 13, 2023, advising Plaintiff that the prison scheduling person was contacted to set up a cardiology appointment. Plaintiff was reminded to take his medication, explaining "[i]f you stop taking the Eliquis, they won't do the cardioversion. I would recommend continuing to take it regularly." Filing No. 6 at 2.

3

> It is not safe to do a cardioversion unless you are taking the Eliquis. As far as I know, you are in the process of getting scheduled to see cardiology again.
>
> In the meantime, you should take the Eliquis both for your safety and so that the procedure can be done.

Filing No. 6 at 3. In response to this instruction, Plaintiff's next IRR stated, "I will not take the Eliquis until my A-Fib is fixed." Filing No. 6 at 4. NDCS responded that, according to the cardiologist, Eliquis must be taken for 30 days both before and after the cardioversion, and it warned Plaintiff that failing to take the medication would delay the procedure and may cause a stroke. Filing No. 6 at 4.

On October 27, 2023, NDCS notified Plaintiff that a cardiology appointment was scheduled to be held in a few weeks, reminded him that the cardioversion treatment would not be done if he was not consistently taking the prescribed Eliquis, and advised Plaintiff to take the medication if he still wanted the treatment. Filing No. 8 at 2. In his court filing dated November 6, 2023, Plaintiff wrote, "The only way I'll take the blood thinning medication is if I'm in the hospital getting prepared for the cardioversion treatment for A-Fib." Filing No. 8 at 1.

Plaintiff submitted an IIR on November 2, 2023, reiterating his refusal to take Eliquis until he was hospitalized for his cardioversion procedure. Plaintiff further complained of left leg swelling, coughing and a buildup of fluid, and terrible headaches. Filing No. 9 at 2. On November 7, 2023, NDCS responded:

> Blood thinner helps prevent clot[s] that may form while you are in a-fib.
>
> If you are cardioverted or return to normal rhythm while there is a clot in your heart, that clot could go to your brain & cause a

4

stroke. It is important to take the blood thinner as prescribed for as long as cardiology wants you to take it prior to return to normal rhythm.

You have an upcoming appointment with cardio to discuss.

Filing No. 9 at 2.

Plaintiff alleges he needs cardioversion for treatment of atrial fibrillation, but the defendants have violated his Eighth Amendment rights by refusing to provide that treatment. Plaintiff states he has repeatedly advised Dr. Brank, a physician who works at the RTC, that his A-Fib prevents him from living a better quality of life. But Dr. Brank refuses to provide proper care to Plaintiff and has lied to Plaintiff about the care NDCS will provide. Filing No. 1 at 13. Plaintiff claims the NDCS Medical Director, Dr. Castleman, has adopted a NDCS policy for providing medical care to inmates which includes a formulary list of medications and medical procedures authorized for inmate care at NDCS' expense. Liberally construed, Plaintiff is claiming he has not received cardioversion treatment because it is expensive and is therefore not included in the formulary list. Plaintiff alleges NDCS does not permit inmates to receive medical care from any outside provider other than BHS, indicating there is likely a contract between them. Plaintiff alleges BHS will not perform the cardioversion because the procedure is not on NDCS' formulary list, and BHS therefore believes it will not get paid if it provides this type of medical care.

## II. APPLICABLE LEGAL STANDARDS ON INITIAL REVIEW

The Court is required to review in forma pauperis complaints to determine whether summary dismissal is appropriate. *See* 28 U.S.C. § 1915(e). The Court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted,

or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). Plaintiffs must set forth enough factual allegations to "nudge[ ] their claims across the line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"A pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted). This means that "if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Stone v. Harry,* 364 F.3d 912, 915 (8th Cir. 2004). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon,* 623 F.2d 1282, 1286 (8th Cir. 1980).

### III. DISCUSSION

Plaintiff requests punitive damages under 42 U.S.C. § 1983. Plaintiff alleges that to save money, the defendants chose to treat his clotting issue, but they refuse to treat his atrial fibrillation. He claims that by delaying his

treatment for atrial fibrillation, the defendants have unnecessarily prolonged his pain and suffering in violation of his Eighth Amendment rights.

## A. Allegations Against Bryan Health Systems

Plaintiff has sued BHS, a private health care entity, for violating his constitutional rights. "Only a state actor can face § 1983 liability." *Doe v. N. Homes, Inc.*, 11 F.4th 633, 637 (8th Cir. 2021). However, a private entity can be considered a state actor under § 1983 in a few limited circumstances, including when the private entity performs a traditional, exclusive public function; when the government compels the private entity to take a particular action; or when the government acts jointly with the private entity. *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019).

The state-actor question is a necessarily fact-bound inquiry. *Doe v. N. Homes, Inc.*, 11 F.4th at 637 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)). The court considers whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority, and whether under the facts of this case, it is appropriate to consider the private entity as a state actor. *Id.* at 637-38.

Providing health care to inmates is neither a traditionally exclusive public function nor is there any allegation that NDCS compelled or had any authority to compel BHS to provide medical care to Plaintiff. Plaintiff theorizes that BHS and NDCS act jointly to provide medical care to inmates pursuant to a contract. To state such a claim, the plaintiff "must plausibly allege a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th Cir. 2014) (cleaned up)

Here, Plaintiff alleges inmates can receive outside medical care from only BHS, so "it can only be concluded that there is a contract between NDCS

and Bryan Health Systems," Filing No. 1 at 13, and as a contractor, BHS is subject to all the same rules and policies as a state employee. Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Plaintiff's allegation of a contract between NDCS and BHS is both speculative and a legal conclusion, and the Court disregards this allegation when reviewing Plaintiff's complaint. As to the state actor issue, the sole remaining allegation is that when an inmate needs outside medical care, NDCS brings inmates to only BHS. This allegation does not allege a mutual understanding, agreement, or a meeting of the minds, between BHS and NDCS. The complaint contains no factual allegations supporting a claim that BHS was a state actor when it allegedly failed to provide medical care to Plaintiff. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (holding the court must conduct a thorough examination of multiple aspects of the relationship before deciding whether a private medical entity is a state actor rests). For this reason alone, Plaintiff's complaint fails to state a § 1983 claim against BHS.

Moreover, "[i]t is well settled that § 1983 does not impose respondeat superior liability." *Hughes v. Stottlemyre*, 454 F.3d 791, 798 (8th Cir. 2006) (internal quotation marks omitted). Even assuming BHS was a state actor, and one of its employees was deliberately indifferent to Plaintiff's medical needs, BHS as an entity cannot be liable to Plaintiff under 42 U.S.C. § 1983 for the actions and inactions of its employees.[1] And to allege entity liability under § 1983, plaintiff must identify a policy or custom that caused the plaintiff's alleged injury. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir.

---

[1] The complaint states Plaintiff does not know whether Dr. Brank is employed by the NDCS or BHS. Since Dr. Brank provided care to Plaintiff at the RTC facility, for the purpose of this initial review, the Court will assume (without deciding) that Dr. Brank is a state actor.

2007). Since Plaintiff's complaint fails to allege that any BHS policy or custom caused Plaintiff's injury, even if the Court assumes BHS was a state actor while treating Plaintiff, the complaint fails to state a claim against this defendant.

Finally, as explained below, even assuming Plaintiff has alleged that BHS was a state actor when it treated (or failed to treat) Plaintiff in accordance with its policy or custom, Plaintiff has not adequately alleged that his Eighth Amendment rights were violated.

### B. Eighth Amendment Claims

Plaintiff claims the defendants violated his Eighth Amendment rights by refusing to treat his atrial fibrillation. Under the Eighth Amendment's prohibition against cruel and unusual punishment, prison officials are forbidden from unnecessarily and wantonly inflicting pain on an inmate by acting with "deliberate indifference" toward serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). A claim of deliberate indifference to medical needs has both an objective and subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

When alleging a deprivation of medical care, the inmate must show (1) an objectively serious medical need and (2) the defendants knew of the medical need but were deliberately indifferent to it. *See Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010); *Jones v. Minnesota Dep't of Corrections*, 512 F.3d 478, 481–82 (8th Cir. 2008); *Albertson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2006); *Grayson v. Ross*, 454 F.3d 802, 808–09 (8th Cir. 2006). A medical need is objectively serious "if the medical need in question is supported by medical

9

evidence, such as a physician's diagnosis, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Hancock v. Arnott*, 39 F.4th 482, 486 (8th Cir. 2022) (quoting *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017). The effects of delayed treatment are considered when evaluating the existence of an objectively serious medical need. *Id*. As to the subjective element, the Plaintiff must plead that each defendant acted with a sufficiently culpable state of mind. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). A plaintiff must show a prison official knew of and disregarded the objectively serious medical need. *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002).

Here, Plaintiff alleges that he has untreated atrial fibrillation which has adversely impacted his quality of life, including his ability to exercise. And the NDCS' responses to Plaintiff's IIRs suggest that atrial fibrillation increases Plaintiff's risk of blood clots and stroke. Plaintiff's alleged injury is objectively serious, and for the purposes of initial review, the objective component is met.

To prove the subjective component, Plaintiff must present facts showing the defendants knew of his atrial fibrillation but deliberately chose not to treat it. "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Redmond v. Kosinski*, 999 F.3d 1116, 1121 (8th Cir. 2021) (quoting *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (cleaned up)).

The record indicates that the defendants knew of Plaintiff's heart condition and knew it could cause serious consequences—the NDCS itself diagnosed the problem by EKG and then immediately transferred Plaintiff to Bryan West Hospital. But based on Plaintiff' submissions in this case, Dr. Brank and BHS did not refuse to treat Plaintiff's atrial fibrillation, and

treatment was not denied because it was not listed in Dr. Castleman's policy of approved procedures. Rather, the cardioversion treatment was withheld because the medical providers refused to perform the procedure until, in their medical judgment, it was reasonably safe to do so. In responses to Plaintiff's IIRs, and during medical appointments, Plaintiff was repeatedly advised that Eliquis must be consistently taken to alleviate the risk of clots and a potential stroke, that the anticipated cardioversion treatment further increases those risks, and therefore the medical providers would not provide that treatment until Plaintiff consistently took his prescribed Eliquis.

Plaintiff apparently disagreed. He refused to take his prescribed Eliquis until hospitalized to receive cardioversion treatment. But "[i]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Saylor v. Nebraska*, 812 F.3d 637, 646 (8th Cir. 2016) (citing *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir.2007) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)). A showing of deliberate indifference "requires more than mere disagreement with treatment decisions.'" *Pietrafeso v. Lawrence Cnty., S.D.*, 452 F.3d 978, 983 (8th Cir. 2006) (quoting *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006)). Plaintiff alleges the defendants committed "deliberate indifference by malpractice," (Filing No. 1 at 5), but mere negligence or medical malpractice are insufficient to rise to an Eighth Amendment violation. *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.")

As to all the named defendants, Plaintiff has failed to allege that his Eighth Amendment rights were violated.

11

## IV. CONCLUSION

The Court is required to dismiss a complaint, or any portion of it, that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

Plaintiff has no civil rights claim against BHS, a private entity, because he has not alleged facts to support a claim that BHS was a state actor when providing medical care to Plaintiff or, even assuming it was, that it failed to treat Plaintiff pursuant to a policy or custom. Moreover, while Plaintiff has alleged an objectively serious medical condition for which treatment has been delayed, based on Plaintiff's complaint and its supplements, cardioversion was not delayed due to the defendants' deliberate indifference to Plaintiff's medical needs. Plaintiff was not denied treatment because of Dr. Castleman's alleged policy foreclosing such care at NDCS' expense, and Dr. Brank and BHS never refused to provide cardioversion if Plaintiff consistently took Eliquis for 30 days prior to the treatment. Rather, Plaintiff did not receive cardioversion treatment on his requested time frame because he refused to follow medical advice and consistently take his prescribed medication.

Plaintiff's complaint falls far short of alleging that any of the defendants violated Plaintiff's Eighth Amendment rights. The complaint must be dismissed.

IT IS ORDERED:

1. This matter is dismissed without prejudice.
2. A separate judgment will be entered.

Dated this 17th day of July, 2025.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
Senior United States District Judge